UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CompuDyne Corporation**<br>2530 Riva Road<br>Annapolis, MD  21401<br><br>and<br><br>**William Blair Mezzanine Capital Fund II, L.P.**<br>222 West Adam Street<br>Chicago, IL  60606<br><br>Plaintiffs<br><br>– against –<br><br>**Hilary L. Shane**<br>200 Central Park South, Apt. 24B<br>New York, NY  10019<br><br>and<br><br>**First New York Securities, L.L.C.**<br>850 Third Avenue, 17th Floor<br>New York, NY  10022<br><br>and<br><br>**FNY Millennium Partners, L.P.**<br>850 Third Avenue, 17th Floor<br>New York, NY  10022 | ECF CASE<br><br>Civil Action<br><br>No. <u>05-CV-4300(RWS)</u><br><br><br>**JURY TRIAL DEMANDED** |

Defendants.

## COMPLAINT

Plaintiffs, CompuDyne Corporation ("CompuDyne" or the "Company") and

William Blair Mezzanine Capital Fund II, L.P. ("Blair") (collectively "Plaintiffs"), by and

through their undersigned attorneys, allege, upon personal knowledge as to themselves and upon

information and belief as to all other matters, as follows:

## NATURE OF THE LAWSUIT

1.     This is an action under federal statutes and regulations, and under the common law, to recover damages from Defendants Hilary L. Shane ("Shane"), First New York Securities, L.L.C. ("FNY"), and FNY Millennium Partners, L.P. ("Millennium"), for injuries and losses suffered by CompuDyne and Blair as a result of a fraudulent and manipulative securities scheme perpetrated by Shane in connection with an offering and sale of CompuDyne common stock in October 2001.

2.     On information and belief, Shane and Millennium made false representations about their investment intent and, as a result, obtained the right to acquire 475,000 shares of CompuDyne common stock that were being offered through a private placement.

3.     On information and belief, Shane then engaged in unlawful insider trading by selling CompuDyne common stock short while in possession of material, non-public information about the Company and the private placement.  Shane then covered her short sales with shares she unlawfully obtained on behalf of herself and Millennium through the private placement.  Shane's illegal short sales, among other things, artificially and fraudulently reduced the market price of CompuDyne common stock, thereby injuring Plaintiffs, and unjustly enriched Defendants in excess of $1.1 million.

## THE PARTIES

4.     CompuDyne is a Nevada corporation with its headquarters and principal place of business in Maryland, and is involved, inter alia, in the business of providing safety and security products.  Its common stock actively trades on an open and efficient market, the Nasdaq National Market, under the symbol "CDCY".

5.     Blair, an Illinois limited partnership with its principal place of business in Illinois, is an investment fund.

6.     On information and belief, Shane is a citizen and resident of the State of New York and, during the time of the actions giving rise to the allegations contained herein, Shane was NASD registered as a general securities representative at FNY, where she served as a manager of hedge fund accounts.

7.     FNY, where Shane was NASD registered and employed at the time of the actions giving rise to the allegations contained herein, is a New York limited liability company with its principal place of business in New York.  FNY is a Manhattan-based broker-dealer and has been a member of the National Association of Securities Dealers ("NASD) since 1985.

8.     Millennium is a limited partnership which maintains a business address at 850 Third Avenue, 17th Floor, New York, NY  10002.  During the time of the actions giving rise to the allegations contained herein, Millennium was an FNY-affiliated hedge fund managed by Shane.

9.     At all material times hereto, Shane was acting within the course and scope of her employment at FNY and as a manager of the FNY-affiliated hedge fund, Millennium.  Thus, unless otherwise specified herein, Shane, FNY, and Millennium are jointly and severally liable for the damages alleged by Plaintiffs herein.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1332.  The Court has supplemental jurisdiction over the claims asserted under state law under 28 U.S.C. § 1367.  Moreover, there is diversity of citizenship and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

11.     Venue is proper in this district under 28 U.S.C. § 1391, and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, in that many of the acts, transactions and occurrences alleged herein, including those connected with the private placement, occurred in this district, and the defendants reside here.

12.     In connection with the acts alleged in this Complaint, Shane, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mail, telephone communications and the facilities of the national securities exchanges.

## FACTS

### The PIPE Transaction

13.     On September 12, 2001, CompuDyne entered into an investment banking relationship with Friedman, Billings, Ramsey & Co. ("FBR") to raise capital by means of a private placement. FBR is engaged in the business of investment banking and is also a broker-dealer registered under the Securities and Exchange Act of 1934. CompuDyne and FBR agreed to structure the private placement as a "Private Investment in Public Equity," or "PIPE" transaction.

14.     A PIPE is a type of transaction where shares are sold to a limited number of sophisticated investors and subsequently registered with the SEC for resale to the general public. A PIPE is commonly used to raise capital quickly.

15.     In a PIPE transaction, "qualified investors" accept the risks associated with buying unregistered shares: because the shares may not be sold to the general public until they have been registered with the SEC, the qualified investors could be locked into the stock while its price declines. Moreover, it is common for the price of shares to decline after the public announcement of a PIPE transaction, because the market anticipates the dilution caused

by the issuances of new shares.  However, qualified investors are generally compensated for accepting such risks with a purchase price which is lower than the prevailing market price.

16.     CompuDyne accepted FBR's recommendation to issue the stock through a PIPE transaction.  As set forth in a September 27, 2001 "Confidential Private Placement Memorandum" ("PPM"), CompuDyne offered to sell 1,076,569 new shares of CompuDyne common stock and at the same time arranged for the sale of another 1,373,431 shares of common stock and warrants controlled by plaintiff Blair.

17.     That Blair intended to sell its holding in CompuDyne; that CompuDyne intended to issue new common shares; and that such shares were being offered in a PIPE transaction, was at the time all material non-public information.

18.     To sell the CompuDyne common stock offered in the PIPE transaction, FBR identified prospective qualified investors (generally investment funds), which FBR told CompuDyne might be interested in purchasing CompuDyne common stock.  FBR then arranged for confidential meetings between (1) representatives of the prospective qualified investors and (2) representatives of CompuDyne and of FBR during a "road show," which occurred in cities from Boston to San Francisco between Friday September 28, 2001, and Thursday October 4, 2001.

19.     The prospective qualified investors agreed in advance of these meetings to treat the information they learned in the road show meetings, as well as the existence of the road show itself and the prospective PIPE transaction itself, as confidential.  The confidentiality agreements with the prospective qualified investors were intended, inter alia, to prevent purchases or sales (including short sales) of CompuDyne common stock by those who learned material non-public information.

### Shane Learns About the CompuDyne PIPE

20.      Not later than September 28, 2001, FBR registered representative Paul Dell'Isola called Shane, who was a regular client of FBR, to discuss the CompuDyne PIPE transaction.

21.      Using a script prepared by CompuDyne's counsel, and without initially divulging CompuDyne's identity, Dell'Isola told Shane that FBR represented an issuer in the electronic security sector that might soon sell some equity.  He told her that the deal would be structured as a PIPE and that, if she were interested, he would disclose who the issuer was and the terms of the potential PIPE transaction, so long as Shane agreed to keep the information he was about to give her confidential.

22.      Shane agreed to keep the information confidential.

23.      In reliance on Shane's agreement to keep the information confidential, Dell'Isola told Shane that CompuDyne was the issuer in question and gave her additional information about the PIPE offering.

24.      After talking to Shane, Dell'Isola instructed that a copy of the CompuDyne Purchase Agreement and PPM be sent to Shane and, on September 28, 2001, FBR sent the documents to Shane's residence by overnight courier.

25.      The information that CompuDyne and FBR gave to Shane about the PIPE deal and about CompuDyne's financial plans included material non-public information.

26.      The CompuDyne Purchase Agreement received by Shane contained a warranty that the purchaser was "acquiring the number of shares set forth in Section 2 above in the ordinary course of its business and for its own account for investment only and with no present intention of distributing any of such Shares."

27.     The CompuDyne Purchase Agreement received by Shane also contained a warranty that "[t]he Purchaser agreed orally with the Placement Agency to keep confidential all information concerning this private placement." The Purchase Agreement further stated that "[t]he Purchaser agrees to use the information contained in the Private Placement Memorandum for the sole purpose of evaluating a possible investment in the Shares . . .."

### Shane Begins to Sell CompuDyne Stock Short While in the Possession of Material, Non-Public Information

28.     On information and belief, beginning on Friday, September 28, 2001, at 3:08 p.m., after talking to Dell'Isola, Shane began to sell CompuDyne stock short in two FNY proprietary accounts and in the accounts of two hedge funds whose trading Shane controlled. Shane continued selling CompuDyne short on Monday, October 1, increasing the total short position for the four accounts to 17,200 shares by the end of trading on October 1.

29.     On information and belief, on Tuesday, October 2, beginning at about 9:41 a.m. and continuing until about 9:43 a.m., Shane sold short another 5,000 shares of CompuDyne stock. By 9:43 a.m. on October 2, Shane had increased the total short position in the four accounts to 22,200 shares.

30.     On October 2, Shane's agents attended a "road show" presentation conducted by CompuDyne's CEO and CFO, and by a representative of FBR.

31.     On information and belief, beginning at about 11:30 a.m. on October 2, Shane sold short approximately 38,600 more shares of CompuDyne stock, thereby increasing the total short position in the four accounts to a total of approximately 60,800 shares by the end of the day.

32.     On information and belief, on Wednesday, October 3, Shane engaged in more short selling of CompuDyne stock, and some buying, increasing the total short position for the four accounts to approximately 88,100 shares by the end of the day.

33.     On information and belief, on Thursday, October 4, Shane continued to sell CompuDyne stock short, and also bought shares, reducing the firm's net short position to approximately 53,100 shares by the end of the day.

34.     On information and belief, Shane continued to buy CompuDyne stock on Friday, October 5, bringing all four accounts flat in CompuDyne by the end of the day.

35.     On information and belief, the profits from the trading in CompuDyne that Shane directed from September 28 through October 5, 2001, were approximately $56,151.

### Shane Decides to Invest in the CompuDyne PIPE

36.     On information and belief, sometime between October 1 and October 5, Shane indicated to FBR that she was interested in buying 500,000 shares of CompuDyne stock in the PIPE, at $14.00 per share.

37.     On information and belief, Shane did not tell FBR or Dell'Isola that she had sold CompuDyne stock short or that she planned to sell CompuDyne stock short in the future.

38.     On information and belief, Shane did no trading on Monday, October 8.

39.     On October 8, CompuDyne and FBR agreed to "price" the PIPE at $12.00 per share.

40.     On information and belief, on October 8 Shane caused the first page and the signature page of two Purchase Agreements to be faxed to FBR at 5:38 p.m. Shane elected to purchase 237,000 shares of CompuDyne stock for herself, in an account she held at FNY.

Defendant Millennium, an FNY-affiliated hedge fund that Shane managed, elected to purchase 238,000 shares of CompuDyne stock.

    41.    By submitting the signed Purchase Agreements, Shane and Millennium represented to CompuDyne and FBR that Shane and Millennium intended to hold the securities for investment purposes and had no intention of distributing the shares.

    42.    Plaintiffs relied on Shane's and Millennium's representations. Had Plaintiffs learned that Shane had already sold CompuDyne short or intended to sell short in the immediate future, and that she planned to use shares acquired in the PIPE transaction to cover those sold short, Shane and Millennium would not have been allowed to purchase their 475,000 shares in the CompuDyne PIPE transaction.

### Shane Again Trades CompuDyne Stock While in the Possession of Material, Non-Public Information

    43.    On information and belief, beginning on Tuesday, October 9, at 8:22 a.m., Shane again began to sell short CompuDyne stock in two accounts: her personal account and Millennium's account. The existence and terms of the PIPE transaction, however, were not made public until 11:44 a.m. that day.

    44.    On information and belief, between 8:22 a.m. and 11:44 a.m. on October 9, Shane, on behalf of herself and Millennium, amassed a total short position of approximately 122,900 shares of CompuDyne stock.

### Shane Continues to Distribute Unregistered PIPE Shares

    45.    On information and belief, Shane continued to sell short CompuDyne stock after 11:44 a.m. on October 9, and from October 9 through October 30, 2001, the sales were made at prices ranging from a low of about $12.41 to a high of about $17.00.

46.     By the time of the effective registration of the PIPE shares at the end of the trading day on October 29, 2001 and the close of the PIPE transaction at $12.00 per share, on information and belief, Shane's and Millennium's combined short positions totaled approximately 455,000 shares.

47.     On information and belief, from October 9 through October 29, 2001, Shane intended to profit by covering the short sales of CompuDyne stock with the shares that she and Millennium were entitled to buy at $12.00 per share when the shares became registered.

48.     At the close of the trading day on October 29, 2001, the SEC declared effective the registration statement for the CompuDyne PIPE shares.

49.     On information and belief, on October 30, 2001, Shane sold short approximately another 20,000 shares, reaching a total short position in CompuDyne stock of approximately 475,000 shares in the two accounts, the number of shares she had agreed to purchase on behalf of herself and Millennium in the PIPE transaction.

### Shane Covers Her Short Position with CompuDyne PIPE Shares

50.     On information and belief, on or about October 31, 2001, Shane covered the combined 475,000-share short position using the 475,000 shares of CompuDyne stock that she bought in the PIPE for $12.00 per share on behalf of herself and Millennium.

51.     On information and belief, the total profits from covering the short positions established by Shane on October 9, 2001, before 11:44 a.m., totaled approximately $315,216.

52.     On information and belief, the additional profits from the CompuDyne short selling directed by Shane after 11:44 a.m. on October 9, 2001, but before the close of trading on October 29, 2001, were approximately $764,818.  Thus, the total profits from Shane's selling of CompuDyne stock from October 9 through October 29, 2001 totaled $1,136,185.

53.     On information and belief, from on or about October 9 through on or about October 29, 2001, Shane caused FNY to execute short sales of 455,000 shares of CompuDyne stock, in approximately 975 separate transactions using multiple brokers to hide the unlawful scheme.

### Shane's Fraud and Market Manipulation

54.     In January 2005, CompuDyne learned that the NASD was investigating Shane with regard to the PIPE transaction and had filed a disciplinary proceeding against Shane charging her with unlawful insider trading and employing an unlawful "scheme or artifice to defraud" under the securities laws and regulations and NASD conduct rules.

55.     Unknown to CompuDyne or Blair until January 2005, Shane had secretly engaged in short selling CompuDyne common stock.

56.     By short selling CompuDyne common stock, Shane was fraudulently misusing her knowledge of the material non-public information of the forthcoming sale of 2,450,000 shares of CompuDyne common stock at $12 per share.

57.     Due to this knowledge of material non-public information, Shane could safely agree to short sell CompuDyne common stock. As to the short sales entered into prior to the announcement of the pricing of the PIPE transaction, instead of being at risk of incurring a loss on the short sales if the price of CompuDyne's common stock went up, Shane was virtually guaranteed a gain because she knew that the announcement of the PIPE transaction would drive the price of the stock down. As to the short sales entered into after she learned of the pricing, Shane was guaranteed a gain because she knew the price of the shares she intended (illicitly and unlawfully) to use to cover the short sales.

58.    Among other things, Shane's short selling contributed to the volatility and decline of CompuDyne's common stock price during the period when the PIPE transaction was being priced.

59.    The market manipulation and fraud inherent in the short selling was particularly egregious because such sales violated a series of rules, regulations and notices, including but not limited to, NASD Conduct Rules 2110, 2120, and IM-2310-2.

60.    At no time did Shane advise CompuDyne or Blair that she was engaging in short selling CompuDyne common stock in violation of the terms of the Purchase Agreement. On the contrary, Shane intentionally hid that fact from Plaintiffs. Had Plaintiffs known of the short selling, they would not have agreed to allow Shane to purchase 475,000 shares in the CompuDyne PIPE on behalf of herself and Millennium.

## Count I

## Violation of Sections 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78(o)(c), and Rules Thereunder, Including 10b-5

61.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 60 as if set forth fully herein.

62.    In September and October 2001, Shane was in possession of material, non-public information about CompuDyne, including but not limited to information that: 1,076,569 new shares of CompuDyne common stock and 1,373,431 shares of common stock and warrants controlled by Blair would be sold to private investors, and that the shares would soon become available for sale to the public at a cost of $12 per share, below the then-market price.

63.    Shane and Millennium intentionally and willfully falsely represented that they were buying CompuDyne stock for investment purposes and had no present intention of distributing the shares, thus inducing CompuDyne to agree to sell 475,000 shares to them.

64.     Shane owed a duty of trust or confidence, as defined under Rule 10b5-2 of the Securities and Exchange Act of 1934, to Plaintiffs, and Shane breached that duty of trust or confidence by misappropriating and misusing material non-public inside information.

65.     Moreover, Shane improperly used this material non-public information to sell CompuDyne common stock short to the detriment and injury of CompuDyne.  Among other things, Shane's misuse of such material non-public information contributed to the volatility and decline of the price of CompuDyne stock prior to the public announcement of the PIPE and thereby deprived Plaintiffs of a higher price at which they could have sold the offered shares had the illegal short selling not occurred.

66.     Further, Shane's illegal use of material non-public information in connection with her scheme of short selling CompuDyne common stock unjustly enriched Defendants in excess of $1.1 million.

67.     By engaging in the foregoing conduct, defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, intentionally or recklessly employed a device, scheme or artifice to defraud, made untrue statements of fact, and engaged in acts, practices or a course of business which operated or would operate as a fraud or deceit in connection with the purchase or sale of a security, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

68.     Shane's misuse of material non-public information also constituted a fraudulent device in violation of Section 15(c) of the Securities and Exchange Act of 1934.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for compensatory damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium

due to the Transaction, any profits derived by Defendants on account of Shane's illegal short selling, and such other relief as the Court may deem just and proper.

## Count II

## Fraud

69.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

70.     As set forth above, defendants directly and indirectly participated in a course of conduct employing devices, schemes and artifices to defraud Plaintiffs in connection with the pricing of the CompuDyne common stock sold in the Transaction, and to induce Plaintiffs to sell Shane and Millennium 475,000 shares of CompuDyne stock in the PIPE transaction.  Such devices, schemes and artifices included Shane's and Millennium's material representations as to their lack of present intention to sell the CompuDyne stock acquired in the PIPE transaction, when they in fact had the opposite intent.

71.     Shane knew and intended that these misrepresentations would decrease the value of CompuDyne common stock before the public announcement of the PIPE and would fraudulently induce CompuDyne and Blair to allow Shane and Millennium to purchase 475,000 shares in the PIPE transaction, when they would not otherwise have been permitted to purchase such shares because of Shane's unlawful intentions with respect to those shares.

72.     Plaintiffs relied upon Shane's and Millennium's misrepresentations.

73.     Shane's and Millennium's willful and intentional misrepresentations allowed them to obtain CompuDyne stock under false pretenses, thereby unjustly enriching Defendants in an amount in excess of $1.1 million.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for compensatory damages, punitive damages, the costs of the prosecution of this

action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Defendants on account of Shane's illegal short selling, and such other relief as the Court may deem just.

## Count III

### Breach of Contract

74.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 73 as if set forth fully herein.

75.     Shane and Millennium entered into Purchase Agreements with Plaintiffs with regard to the PIPE transaction. In the Purchase Agreements, Shane and Millennium warranted that they were "acquiring the number of shares set forth in Section 2 above in the ordinary course of [their] business and for [their] own account for investment only and with no present intention of distributing any of such shares."

76.     The Purchase Agreements also contained a warranty that "[t]he Purchaser agreed orally with the Placement Agency to keep confidential all information concerning this private placement." The Purchase Agreements further provided that "[t]he Purchaser agrees to use the information contained in the Private Placement Memorandum for the sole purpose of evaluating a possible investment in the Shares . . .."

77.     Shane and Millennium breached these promises by misusing non-public confidential information through Shane's short selling of CompuDyne stock both before and after the public announcement of the PIPE transaction, and by purchasing shares with the intention of using them to cover her illicit short sales.

78.     As a proximate result of Shane and Millennium's breach of contract, Plaintiffs were injured with regard to the pricing of the PIPE transaction, and Shane and Millennium were unjustly enriched in excess of $1.1 million.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Shane and Millennium for compensatory damages, punitive damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Shane and Millennium on account of Shane's illegal short selling, and such other relief as the Court may deem just and proper.

## Count IV

## Conversion

79.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 78 as if set forth fully herein.

80.     Defendants have converted Plaintiffs' property through Shane's participation in the short sale scheme.  The value of the CompuDyne common stock in the Transaction in excess of the $12.00 sale price was illegally converted to the benefit of Defendants through short sales.

81.     The conversion of this property was intentional, malicious and without either lawful justification or the consent of Plaintiffs.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for compensatory damages, punitive damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Defendants on account of Shane's illegal short selling, and such other relief as the Court may deem just and proper.

## Count V

## Unjust Enrichment

82.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 81 as if set forth fully herein.

83.     Defendants have been unjustly enriched through Shane's participation in the short sale scheme. Any trading profits, good and/or other thing of value obtained by Defendants from the short sales constituted unjust enrichment at the expense of Plaintiffs.

84.     Defendants' unjust enrichment was intentional, malicious and without either lawful justification or the consent of Plaintiffs.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for compensatory damages, punitive damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Defendants on account of her illegal short selling, and such other relief as the Court may deem just and proper.

## Count VI

## FNY's Control Person Liability Under
## Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a)

85.     Plaintiffs incorporate the allegations contained in paragraphs 1 through 84 as if set forth fully herein.

86.     As set forth above, Shane knowingly and willfully violated the federal securities laws and the regulations promulgated thereunder by misusing material non-public information and engaging in a scheme or artifice to defraud Plaintiffs through the illegal short selling of CompuDyne common stock.

87.    At all relevant times herein, Shane was employed and registered at FNY. As Shane's employer, FNY was in a position of authority over Shane and had the power to control, directly or indirectly, the actions and decisions of Shane. FNY, therefore, was a controlling person of Shane within the meaning of Section 20(a) of the Securities and Exchange Act of 1934.

88.    As a controlling person of Shane, FNY is liable for the fraudulent and deceptive conduct perpetrated by Shane in the course of her employment at FNY and in violation of the securities laws and regulations as set forth above.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against FNY as a controlling person under section 20(a) of the Securities and Exchange Act of 1934 for compensatory damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Defendants on account of Shane's illegal short selling, and such other relief as the Court may deem just and proper.

## Count VII

### FNY's Respondent Superior Liability

89.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 88 as if set forth fully herein.

90.    At all relevant times herein, Shane was registered and employed at FNY.

91.    As set forth above, the material misrepresentations and fraudulent course of conduct made by Shane and relied upon by Plaintiffs were made during the course of and in the scope of Shane's employment at FNY.

92.     Thus, FNY, as Shane's employer, is vicariously liable under the doctrine of respondeat superior for the injuries and damages Plaintiffs suffered as a result of Shane's unlawful conduct.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against FNY for compensatory damages, punitive damages, the costs of the prosecution of this action, reasonable attorneys' fees, expert fees, interest, the voidance of the shares issued to Shane and Millennium due to the Transaction, any profits derived by Defendants on account of Shane's illegal short selling, and such other relief as the Court may deem just and proper.

GEIGER and ROTHENBERG, LLP

Dated: April 29, 2005          By: _____
                                    Alexander Geiger, Esquire (AG-8974)
                                    30 Vesey Street, 4th Floor
                                    New York, NY  10007
                                    Phone:  (212) 227-3860
                                    Facsimile:  (212) 227-3866

**OF COUNSEL**:

Darryl J. May, Esquire
Thomas B. Roberts, Esquire
BALLARD SPAHR ANDREWS &
    INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
Phone:  (215) 665-8500
Fax:  (215) 864-8999

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**CompuDyne Corporation**
2530 Riva Road
Annapolis, MD  21401

    and

**William Blair Mezzanine Capital Fund II, L.P.**
222 West Adam Street
Chicago, IL  60606

                        Plaintiffs

  -- against --

**Hilary L. Shane**
200 Central Park South, Apt. 24B
New York, NY  10019

    and

**First New York Securities, L.L.C.**
850 Third Avenue, 17th Floor
New York, NY  10022

    and

**FNY Millennium Partners, L.P.**
850 Third Avenue, 17th Floor
New York, NY  10022

            Defendants.

ECF CASE

Civil Action

No. 05-CV-4300(RWS)

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby

demand trial by jury of the within action.

GEIGER and ROTHENBERG, LLP

Dated: April 2?, 2005

By: _____

Alexander Geiger, Esquire (AG-8974)
30 Vesey Street, 4th Floor
New York, NY 10007
Phone: (212) 227-3860
Facsimile: (212) 227-3866

**OF COUNSEL**:

Darryl J. May, Esquire
Thomas B. Roberts, Esquire
BALLARD SPAHR ANDREWS &
    INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Phone: (215) 665-8500
Fax: (215) 864-8999