UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

COMPUDYNE CORP., et al.,

             Plaintiffs,

   - against -

HILARY L. SHANE, et al.,

             Defendants.

------------------------------------------X

05 Civ. 4300 (RWS)

O P I N I O N

A P P E A R A N C E S:

Attorneys for Plaintiffs:

    KLAFTER & OLSEN LLP
    1311 Mamaroneck Avenue, Suite 220
    White Plains, NY 10605
    By:  JEFFREY A. KLAFTER, ESQ.
        Of Counsel

    KLAFTER & OLSEN LLP
    2121 K Street, N.W., Suite 800
    Washington, DC 20037
    By:  KURT B. OLSEN, ESQ.
        Of Counsel

Attorneys for Defendants:

    KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
    New York, NY 10036
    By:  ARTHUR H. AUFSES, III, ESQ.
        STEPHEN M. SINAIKO, ESQ.
        CRAIG L. SIEGEL, ESQ.
        Of Counsel

    DLA PIPER RUDNICK GRAY CARY US LLP
    1251 Avenue of the Americas
    New York, NY 10020
    By:  CARYN MAZIN SCHECHTMAN, ESQ.
        Of Counsel



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9 29 06

**Sweet, D.J.,**

Defendants Hilary L. Shane ("Shane"), First New York Securities, L.L.C. ("FNY Securities"), FNY Millennium Partners, L.P. ("FNY Millennium"), and FNY Capital Corp. ("FNY Capital") (collectively, "Defendants"), have moved pursuant to Rules 9(b) and 12(b)6, Fed. R. Civ. P., and the Private Securities Litigation Reform Act ("PSLRA") to dismiss the first amended complaint ("FAC") of plaintiffs CompuDyne Corporation ("CompuDyne") and William Blair Mezzanine Capital Fund II ("Blair") (collectively, "Plaintiffs"). For the reasons set forth below, the motions of Shane, FNY Securities, and FNY Millennium and FNY Capital are granted as to Plaintiffs' unjust enrichment claims, and are denied in all other respects.

## Prior Proceedings

The complaint by CompuDyne and Blair was filed on May 2, 2005. The FAC was filed on September 19, 2005.

Shane, FNY Securities, and FNY Millennium and FNY Capital filed their respective motions to dismiss on October 24, 2005. Plaintiffs filed their joint opposition to all Defendants' motions to dismiss on November 21, 2005. The motions were heard and marked fully submitted on December 7, 2005.

1

**The Parties**

CompuDyne is a Nevada corporation with its headquarters and principal place of business in Maryland and is involved, inter alia, in the business of providing safety and security products. Its common stock actively trades on the Nasdaq National Market under the symbol "CDCY." As of August 14, 2001, CompuDyne had 5,078,522 shares of common stock outstanding. (FAC ¶ 4.)

Blair is an Illinois limited partnership and investment fund with its principal place of business in Illinois. (FAC ¶ 5.) As of August 14, 2001, Blair owned 1,075,507 shares of unregistered CompuDyne common stock and a warrant to purchase 297,924 shares of CompuDyne stock at $3.25 per share. (Id.)

Shane is a citizen and resident of the State of New York and in 2001 was registered with the National Association of Securities Dealers ("NASD") as a general securities representative at FNY Securities, where she served, inter alia, as a manager of hedge fund accounts and held Series 7 and 55 licenses. (FAC ¶ 6.)

FNY Securities, a New York limited-liability company with its principal place of business at 850 Third Avenue, New York, New York 10022, is a Manhattan-based broker-dealer and has been a member firm of NASD since 1985. (FAC ¶ 7.) According to its website, FNY Securities is a "leading global proprietary trading

2

and money management firm with offices in New York, New Jersey and London" where, inter alia, its staff invest FNY Securities' capital in stock for their own profit and pay a certain percentage of their trading profits to the firm. (Id.) FNY Securities requires its staff to complete a training program lasting eighteen to twenty-four months, during which employees are paid a pro-rated salary. (Id.) Employees continue to receive a salary from FNY Securities after the training program is completed. At the time of the actions giving rise to the allegations contained herein, Shane was registered with the NASD as a general securities representative at FNY Securities. (Id.)

FNY Millennium is a limited partnership that maintains a business at the same location as FNY Securities, and in 2001 was an FNY Securities-affiliated hedge fund managed by Shane. (FAC ¶ 8.) Rather than investing FNY Securities' funds, FNY Millennium invests the funds of qualified outside investors. (Id. ¶ 9.)

FNY Capital, a wholly owned subsidiary of FNY Securities, is the general partner of a family of individually managed hedge funds, including FNY Millennium, operating under the umbrella of FNY Securities. (Id.) FNY Securities' website directs investors to contact FNY Securities for further information regarding FNY Capital and investing in its "family of funds." (Id.)

3

**The Facts**

The following facts are drawn from the FAC, which includes "any documents incorporated in it by reference, annexed to it as an exhibit, or 'integral' to it because it 'relies heavily upon [such documents'] terms and effect[s].'"  Pollock v. Ridge, 310 F. Supp. 2d 519, 524 (W.D.N.Y. 2004) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).  All well-pleaded allegations are accepted as true for the purpose of this motion. See Chambers, 282 F.3d at 152.  The following statements do not constitute findings of the Court.

In August 2001, Blair wanted to sell its 1,075,507 unregistered shares of CompuDyne stock.  (FAC ¶¶ 5, 13.)  To facilitate the sale, CompuDyne approached Friedman, Billings, Ramsey & Co. ("FBR") in August 2001 and formally retained FBR on September 12, 2001 -- the day after the terrorist attacks on September 11, 2001.  (FAC ¶ 13.)  When the markets reopened on September 17, 2001, CompuDyne's stock traded much higher than it had during the preceding three years, presumably due to investor belief that there would be greater demand for CompuDyne's products following the 9/11 attacks.  (FAC ¶ 14.)  During the period September 17, 2001 through September 28, 2001, CompuDyne stock traded in a range between $10.05 and $18.78 per share, as compared to its close on September 11, 2001 of $8.25 per share.  (Id.)

4

Due to the increase in the price of CompuDyne stock,
CompuDyne determined to sell stock alongside Blair through a
private investment in public equity ("PIPE") offering.  A PIPE
transaction involves the sale of unregistered stock in a publicly
owned company to sophisticated private investors.  The stock sold
in a PIPE offering is not freely transferable until the issuer
registers the securities with the Securities and Exchange
Commission ("SEC").  SEC rules requires that shares sold by means
of a PIPE can only be sold to "accredited investors" who commit to
purchase an agreed upon number of restricted shares for the
offering price.  (FAC ¶ 16.)  The company agrees to file a
registration statement for the shares which, once effective, will
allow the company to deliver registered shares at the closing of
the PIPE offering in exchange for payment.  (Id.)  Due to the
increase of the number of shares available to trade, and
accompanying dilution of the interests of existing stockholders in
a company, the public announcement of a PIPE typically results in
a decline in the market price of the subject company.  It is for
this reason that the shares offered by means of a PIPE are
typically offered at a discount to the prevailing market prices
before public announcement of the PIPE.  (Id.)

Shane was a regular client of FBR while working at FNY
Securities.  (FAC ¶¶ 6-9, 21.)  On September 28, 2001, FBR
representative Paul Dell'Isola ("Dell'Isola") approached Shane as
a prospective investor in the PIPE.  (FAC ¶ 21.)  After first

5

obtaining Shane's agreement to keep the existence and nature of the PIPE confidential, FBR told her about the PIPE and agreed to send Shane the purchase agreement (the "Purchase Agreement") and the private placement memorandum ("PPM") by overnight mail. (FAC ¶¶ 21-25.) Immediately thereafter, according to the FAC, Shane initiated a fraudulent scheme to allow herself and the other Defendants to improperly profit from CompuDyne's PIPE. (FAC ¶ 29.)

Beginning on September 28, 2001, Shane sold CompuDyne stock short in two FNY Securities proprietary accounts and in the accounts of two FNY Securities-affiliated hedge funds managed by Shane. (FAC ¶ 29.) One of those hedge funds was FNY Millennium. (FAC ¶¶ 8, 61, 70(a)-(b).) Those short sales continued even after Shane received the PPM on September 29, 2001. The PPM provided several warnings and restrictions, including, inter alia, that "the federal securities laws imposed restrictions on trading based upon information regarding the offering," and that "[t]he Purchaser agrees to use the information contained in the Private Placement Memorandum for the sole purpose of evaluating a possible investment in the Shares." (FAC ¶ 28.) Shane continued to sell short shares of CompuDyne based upon material non-public information on October 1, 2, 3, and 4. (FAC ¶¶ 29-34.) At its peak, the total short position in the four accounts was approximately 88,100 shares. (FAC ¶ 33.)

6

Between October 3 and October 5, 2001, Shane bought shares of CompuDyne stock sufficient to cover the short sales and bring all accounts "flat" in Compudyne stock by the end of the day on Friday, October 5, 2001. (FAC ¶ 33-35.) The total profits from the trading in CompuDyne stock that Shane directed from September 28 through October 5, 2001 (the "Pre-Pricing Sales") were approximately $56,151. (FAC ¶ 36.)

During this period, as Shane knew, CompuDyne and FBR were gauging investor interest in the PIPE through, inter alia, private road shows, to determine at what discount from the market price the PIPE shares would be offered. (FAC ¶¶ 16, 19-20, 31, 69, 71-72.) Shane sent her representatives to attend one such road show at FNY Securities' offices on October 2, 2001.[1] (FAC ¶ 31.) On or before Friday, October 5, 2001, Shane indicated to FBR that she was interested in purchasing 500,000 shares of the PIPE at $14.00 per share. (FAC ¶ 37.)

The following Monday, October 8, 2001, FBR and CompuDyne agreed to price the PIPE at $12 per share. (FAC ¶ 40.) Shane, FNY Millennium, and FNY Capital were apprised of the price later that day (FAC ¶ 41), and at 5:38 p.m., two signature pages from the Purchase Agreement were faxed from FNY Securities' offices to FBR, one for 238,000 shares signed on behalf of FNY Millennium by

---

[1] At that meeting, CompuDyne's CEO and CFO reiterated the confidential nature of the PIPE. Id. Nevertheless, Shane sold short 43,600 shares of CompuDyne stock that day. (FAC ¶¶ 30, 32.)

7

Michael Friedman of FNY Capital, and one signed by Shane for
237,000 shares.    (FAC ¶¶ 6, 9, 41.)    However, those shares could
not be delivered to Shane and FNY Millennium -- nor did they
legally acquire ownership of the shares -- until the SEC declared
the registration statement effective.    (FAC ¶¶ 45, 50.)

In addition to the warranties and representations in the
Purchase Agreement described above, by signing the Purchase
Agreement, Shane, FNY Millennium, and FNY Capital also warranted
that each was "acquiring the number of shares . . . in the ordinary
course of its business and for its own account for investment only
and with no present intention of distributing any of such Shares."
(FAC ¶ 28.)    The FAC alleges that Shane, FNY Millennium, and FNY
Capital did not intend to comply with this provision but rather to
conduct extensive "naked" short sales, later using the shares
obtained in the PIPE transaction to "cover" these short positions
at a virtually guaranteed lower price, thereby generating huge, but
illegal, profits.    (FAC ¶¶ 45, 56-57, 60.)

On the morning of October 9, Shane resumed her trading of
CompuDyne stock, selling short 122,900 shares by 11:44 a.m., when
the PIPE was publicly announced.    (FAC ¶¶ 44-46.)

Following the public announcement of the PIPE, Shane and
FNY Millennium continued their naked short-selling through October
29, 2001, when the SEC declared effective the registration

8

statement for the CompuDyne PIPE shares. (FAC ¶ 49-50.) At the close of trading on October 29, 2001, Shane and FNY Millenium had a combined total short position of 455,000 shares. (FAC ¶ 48.) On October 30, 2001 Shane and FNY Millenium sold short an additional 20,000 shares of CompuDyne stock, reaching a combined total short position of 475,000 shares -- the exact number of shares they had agreed to purchase in the PIPE. (FAC ¶ 51.)

On October 31, 2001, Shane and FNY Millenium covered their combined short position with the 475,000 shares of CompuDyne stock purchased in the PIPE for twelve dollars per share, reaping allegedly illegal profits exceeding $1 million. (FAC ¶¶ 52-54.) The shorting of the 475,000 shares was accomplished through 975 separate transactions, all of which were executed by FNY Securities. (FAC ¶ 55.)

On December 21, 2004, the NASD filed a complaint against Shane alleging fraud and insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. (FAC ¶ 3.) On May 18, 2004, the SEC filed a similar complaint. In connection with these civil complaints, Shane agreed to pay $1.45 million in profits and penalties and was permanently barred from associating with any NASD registered firm. (Id.)

The FAC alleges that as a result of Defendants' actions, the market price of CompuDyne stock increased in volatility and/or

9

was artificially depressed during the period when the PIPE was being priced, causing Plaintiffs to sell the shares offered in the PIPE at an artificially depressed price. (FAC ¶¶ 61, 72.) Both Plaintiffs allege that but for the conduct of Defendants, they would have raised more money on the PIPE. CompuDyne additionally has alleged that it suffered unnecessary interest expense associated with capital borrowed to make up for the shortfall in proceeds from the PIPE. (FAC ¶ 74.)

The FAC asserts seven causes of action. Count I alleges violations by Shane, FNY Millennium, and FNY Capital of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges "control person" liability of FNY Securities and FNY Capital under Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a). Count III alleges common-law fraud on the part of Shane, FNY Millennium, and FNY Capital. Counts IV and V allege alternative claims of breach of contract and unjust enrichment, respectively, against Shane, FNY Millennium, and FNY Capital. Count VI alleges the respondeat superior liability of FNY Securities for the damages Plaintiffs suffered as a result of Shane's allegedly unlawful conduct. Count VII alleges that FNY Capital is liable under a theory of partnership liability for the damages Plaintiffs suffered as a result of the allegedly illegal short sales carried out through FNY Millennium.

10

**Discussion**

**The Applicable Standards**

On a motion to dismiss, "the facts in the complaint are presumed to be true and all factual inferences must be drawn in plaintiff's favor and against the defendants." Dietrich v. Bauer, 76 F. Supp. 2d 312, 324 (S.D.N.Y. 1999) ("Dietrich II"). A court should not grant a motion to dismiss "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015, at *5 (S.D.N.Y. April 22, 2004). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). Defendants' burden on a motion to dismiss pursuant to Rule 12(b)(6) is indeed substantial, as "[i]t has been said that the motion to dismiss for failure to state a claim is disfavored and is seldom granted." In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003); see also Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000).

On a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

Rule 9(b), Fed R. Civ. P., provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against it, (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud, and (3) to reduce the number of strike suits. See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.

12

1987); O'Brien v. Price Waterhouse, 740 F. Supp. 276, 279 (S.D.N.Y. 1990), aff'd, 936 F.2d 674 (2d Cir. 1991).

The Private Securities Litigation Reform Act of 1995 (the "PLSRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in scattered sections of 15 U.S.C.), imposes at least two additional pleading requirements -- commonly referred to as paragraphs (b)(1) and (b)(2) -- on securities actions. Paragraph (b)(1), which applies to securities claims alleging misstatements or omissions of material facts, requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Paragraph (b)(2) applies to securities claims "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," and requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

13

## The Motions To Dismiss Count I Are Denied

Count I of the FAC alleges violations of section 10(b) and Rule 10b-5 committed by Shane, FNY Millennium, and FNY Capital, arising out of the scheme described above.  (FAC ¶¶ 64-77.)

Section 10(b) of the Exchange Act makes it unlawful for any person

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

14

17 C.F.R. § 240.10b-5.

This standard is the bedrock of liability under the federal securities laws. Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972) ("The 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" (quoting SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186 (1963)).

A plaintiff bringing a claim of misrepresentation under section 10(b) and Rule 10b-5 "must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Furthermore, the false statement or omission underlying the claim must be made "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 CFR 240.10b-5.

In United States v. O'Hagan, 521 U.S. 642 (1997), the Supreme Court explained that "a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." Id. at 652-54. It is antithetical to the

15

concept of keeping information private or secret that the
information be used by the person receiving the information for
their own personal benefit without obtaining the express approval
to so use it.  A reasonable reading of Shane's representation is
that she confirmed that she would neither disclose the information
nor use it for her benefit.

In addition, Shane concealed from Plaintiffs'
representative, Dell'Isola, a material fact that was necessary to
disclose in light of the circumstances, namely, that she intended
to trade on the confidential non-public information by selling
short CompuDyne stock and later covering the short sales with
shares obtained through the PIPE.  (FAC ¶¶ 60-62, 67-69.)  It is
alleged that FBR would not have revealed the identity of the issuer
of, or the terms of, the PIPE had Shane disclosed this material
fact.  (FAC ¶¶ 22, 62.)

The FAC alleges that after speaking with Dell'Isola,
Shane began to sell CompuDyne stock short on Friday, September 28,
2001 at 3:08 p.m. (FAC ¶ 29), on Monday, October 1, and for the
following three trading days.

These allegations therefore adequately support the claim,
at this stage of the proceedings, that Shane, a NASD registered
representative of FNY Securities who also held Series 7 and 55
licenses, falsely stated that she would keep the confidential

16

information concerning the existence of the PIPE confidential and
concealed her plan to unlawfully profit from her knowledge of the
confidential PIPE.   See Internet Law Library, Inc. v. Southridge
Capital Mgmt., LLC, 223 F. Supp. 2d 474, 482-83 (S.D.N.Y. 2002)
("Internet Law Library") (holding that defendants' statements "that
they would never manipulate [subject] stock in order to depress its
price" were actionable); Nanopierce Tech., Inc. v. Southridge Cap.
Mgmt. LLC, No. 02 Civ. 0767 (LBS), 2002 U.S. Dist. LEXIS 24049, at
*8-11 (S.D.N.Y. Oct. 10, 2002) (holding that failure to disclose
intention to manipulate stock actionable).


Under the PSLRA, a complaint alleging violations of §
10(b) of the Exchange Act must state "facts giving rise to a strong
inference that the defendant acted with the required state of
mind."  15 U.S.C. § 78u-4(b)(2).  As this Court held in Dietrich
II:

   Allegations of scienter are not subject to the same
   exacting scrutiny applied to the other components of
   fraud, such as direct participation.  Scienter can be
   alleged by conclusory allegations if they are supported
   by facts giving rise to a strong inference of fraudulent
   intent.  The inference may be established either "(a) by
   alleging facts to show that defendants had both motive
   and opportunity to commit fraud, or (b) by alleging facts
   that constitute strong circumstantial evidence of
   conscious misbehavior or recklessness."

Dietrich II, 76 F. Supp. 2d at 329 (citations omitted); Ganino v.
Citizens Utilities Co., 228 F.3d 154, 169-70 (2d Cir. 2000).

17

The FAC alleges that Shane engaged in unlawful short sales based on confidential non-public information.  Such unlawful activity has been held, in and of itself, to be highly probative of scienter.    See In re IPO Sec. Litig., 241 F. Supp. 2d 281, 277 (S.D.N.Y. 2003) (scienter adequately pled where defendants engaged in deliberately unlawful conduct).

Shane has suggested that federal regulators found no fault with her pre-pricing trades.  (See Shane Mem. at 8.)  To the contrary, the NASD specifically alleged, based upon its investigation, that Shane violated Section 10(b) and Rule 10b-5 when she unlawfully traded "[i]n September and October 2001" while "in possession of material, non-public information about CDCY." (NASD Compl. ¶ 49, attached as Exhibit A to the Declaration of Jeffrey A. Klafter.)   The Court may take judicial notice of this document because it is specifically referred to in the FAC.   See, e.g., Cortes Indus. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

Shane's statement that she would keep the existence of the PIPE "confidential" and almost immediate accumulation of a significant short position in CompuDyne stock further supports the requisite intent to defraud.  See In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 416 (S.D.N.Y. 1998) (denying summary judgment and finding that closeness in time between employee's termination and his complaint of illegal activity supported scienter).  Shane's

18

short selling after executing the Purchase Agreement further evidences her intent to deceive and the fraudulent scheme initiated on September 28, 2001. See, e.q., In re Scholastic Corp. Sec. Litiq., 252 F.3d 63, 73 (2d Cir. 2000), cert. denied, 534 U.S. 1071, (2001); Ottman v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 345 (4th Cir. 2003) (a court "should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter."). Lastly, a strong inference of Shane's scienter is established by her motive and opportunity to commit fraud. Dietrich II, 76 F. Supp. 2d at 329. Shane has not disputed motive and opportunity to perpetrate the alleged fraudulent scheme. See, e.q., Internet Law Library, 223 F. Supp. 2d at 484-85 (scienter adequately pled by motive to engage in short-sale scheme to, in part, drive down the price of the stock to gain an increased number of shares).

Shane has contended that the fact that she covered FNY Millennium's and her pre-pricing shorts on Friday, October 5, 2001, prior to her execution of the Purchase Agreement on Monday, October 8, 2001, is inconsistent with an intent to defraud. (Shane Mem. at 13-14.) The contention fails to support the motion to dismiss in light of the evidence of fraud here. See Dietrich II, 76 F. Supp. 2d at 339 ("Whether . . . CS First Boston and Green-Cohn purchased the stock for legitimate investment purposes, or whether [they] did so to artificially inflate the price of Scorpion stock is a question of fact that may not be resolved on a motion to

19

dismiss."); see also Internet Law Library, 223 F. Supp. 2d at 486 (allegations of shorting a stock and covering shorts consistent with a scheme to manipulate the price of the stock).

Shane has contended that her covering of the pre-pricing shorts establishes that she did not benefit from inside information and therefore could not have "misused" it. (Shane Mem. at 13.) The FAC alleges that these unlawful pre-pricing short sales contributed to a lower offering price for the PIPE shares which Shane used to cover subsequent short sales, realizing additional profits of over $1 million. (FAC ¶ 54.) See, e.g., Internet Law Library, 223 F. Supp. 2d at 484 (rejecting defendants' argument that they did not benefit from a decline in the price of the stock they shorted and stating that the fact they stood to gain from an increase in the stock price "does not foreclose the possibility that they stood to gain even more from a decline in the price of [the company's] stock.").

## Market Manipulation Has Been Adequately Alleged

Rules 10b-5(a) and (c) provide a distinct cause of action against Defendants for the use of any device, scheme, or artifice to defraud or the participation in any act, practice, or course of business that would perpetrate fraud on investors. In re Enron Corp. Sec., Deriv. & ERISA Litig., 235 F. Supp. 2d 549, 577 (S.D. Tex. 2002); see also In re Global Crossing Sec. Litig., 322 F.

Supp. 2d 319, 335-36 (S.D.N.Y. 2004).   A claim under these subsections does not require "the making of an untrue statement of material fact or omission to state a material fact." Enron, 235 F. Supp. 2d at 577.  See SEC v. Zandford, 535 U.S. 813, 820-22 (2002) (quoting Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) (stating misrepresentation need not be involved and that suit could be based on Rules 10b-5(a) or (c)); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) ("Parmalat II"); Global Crossing, 322 F. Supp. 2d at 335; In re IPO, 241 F. Supp. 2d at 385.

To state a claim of market manipulation under Rule 10b-5(a) and (c), a plaintiff must allege "that the defendant (1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries." In re Parmalat Sec. Litig., 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996)).

In addition, where, as here, "the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by Rule 9(b) is somewhat relaxed." Dietrich II, 76 F. Supp. 2d at 339; see also In re IPO, 241 F. Supp. 2d at 385; Internet Law Library, 223 F. Supp.

21

2d at 486.   Indeed, "more generalized allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleged participation." Id.; In re IPO, 241 F. Supp. 2d at 386 n.103 (citing to the many courts within this district that have adopted the "'nature, purpose, and effect' formulation for pleading market manipulation"); accord In re Blech Sec. Litig., 961 F. Supp. 569, 585 (S.D.N.Y. 1997) ("Blech II").

The FAC pleads that these Defendants engaged in a fraudulent scheme to profit by depressing the price of CompuDyne stock during the period in which the PIPE was being priced and then shorting CompuDyne stock and covering those short positions with the shares to be delivered on the PIPE.   (FAC ¶¶ 64-73.)

The FAC alleges that CompuDyne stock was manipulated by substantial short sales based upon non-public information provided to Shane, as a registered representative of FNY Securities and the manager of FNY Securities' proprietary hedge funds, including FNY Millennium.   (FAC ¶¶ 6, 87-9, 21-55.)   It lists the dates of the short sales in CompuDyne stock and the number of shares sold short on each date by Shane on behalf of FNY Securities and two hedge funds she controlled, including FNY Millennium, (FAC ¶¶ 29-30, 32-36, 46-48, 51-55), and alleges that this unlawful short selling artificially depressed the price and contributed to the volatility of CompuDyne stock during the crucial period during which the PIPE was being priced, and that as a result, Plaintiffs received less

22

from the PIPE offering than they would have had the price of
CompuDyne stock not been so manipulated.  (FAC ¶¶ 61, 69, 72-73.)

         Allegations comparable to those present here have been
held to sufficiently plead a fraudulent scheme in compliance with
Fed. R. Civ. P. 9(b).  In HealthExtras, Inc. v. SG Cower Securities
Corp., No. 02 Civ. 9613 (RO), 2004 U.S. Dist. LEXIS 698 (S.D.N.Y.
Jan. 20, 2004), the plaintiff alleged that the defendants actively
sold HealthExtras stock short and engaged in other transactions
that had the effect of depressing the price of HealthExtras stock
during the period in which a PIPE for the plaintiff was being
priced.  Id. at *1-*2.  The trading at issue was conducted by
Pollet, a managing director of SG Cowen Securities Corp. ("SG
Cowen"), on behalf of its parent, Societe Generale.  Id.  The court
found the allegations, which included the dates and amounts of the
short selling, to be sufficient against both SG Cowen and Societe
Generale, stating:

     HealthExtras' first claim is for securities fraud under
     Section 10(b) of the Securities Exchange Act of 1934 and
     Rule 10b-5; that the defendants traded on material non-
     public information and in so doing, manipulated the price
     of HealthExtras stock; that the defendants made material
     misrepresentations  as  to  SG  Cowen's  policies  and
     procedures to limit hedging and short-selling in advance
     of the offering and that HealthExtras relied on those
     representations; and that if SG Cowen's representations
     had been true, and Pollet had not traded on material
     inside information, it would have received more in the
     offering.   These allegations are sufficient to state a
     claim for securities fraud.

                              23

2004 U.S. Dist. LEXIS 698, at *2-*3 (citing.[2]

In Internet Law Library, the plaintiffs alleged that the defendant, Thomson Kernaghan & Co., acting on behalf of itself and other defendants, sold Internet Library stock short and otherwise manipulated the price of its stock to unlawfully profit from Internet Library's upcoming sale of convertible preferred stock. 223 F. Supp. 2d at 478-79. Plaintiffs there alleged that defendants' short sales were designed to drive the price of Internet Library stock down, which would, in turn, require the company to provide more shares upon the exercise of the conversion feature of the preferred stock, which defendants used to cover the short sales. Id. at 479. Rejecting the defendants' argument that the complaint lacked the requisite specificity, the court held:

> The plaintiffs have adequately detailed what manipulative acts the defendants have undertaken against them. For example, they have described how defendants manipulated the price of ITIS stock by "dumping a large volume of stock on the market," by employing "pre-arranged sales" and "short sales," "covering short positions," and "painting the tape." They have listed specific short sales by defendant Thomson Kernaghan and provided dates and the number of shares sold short for each trade. They have described the effect that such activity has had on the market for ITIS stock, namely that it has artificially depressed the price of ITIS stock to the benefit of defendants and detriment of plaintiffs.

---

[2]    See also Nanopierce Technologies, Inc. v. Southridge Capital Management LLC, 2002 U.S. Dist. LEXIS 24049, at *30-31 (market manipulation adequately alleged by, inter alia, the timing of the short sales, and the trading volume in relation to the overall volume in the plaintiff's stock).

24

223 F. Supp. 2d at 486 (citations omitted).  The FAC at issue here contains the same level of specificity.[3]

The FAC sufficiently alleges the roles of Shane, FNY Millennium, and FNY Capital in this fraudulent scheme at this juncture of the action.  Shane does not challenge, nor can she, her integral role in shorting CompuDyne stock in well over 975 transactions over a month-long period.  Similarly, the FAC alleges that many of the unlawful short sales were effectuated by FNY Millennium.  (FAC ¶¶ 2-9, 29-36, 41-42, 44-49, 51-54.)

The FAC also alleges that FNY Capital played an integral role in the fraudulent scheme by executing the Purchase Agreement by which FNY Millennium would be able to acquire 238,000 shares of the PIPE at $12 per share (FAC ¶ 41), and shared in the profits of the fraudulent scheme.  (FAC ¶ 70.)  Further, it alleges that Shane was acting on behalf of FNY Capital and FNY Millennium.

These allegations are sufficient to satisfy Rule 9(b).  As this Court held in In re Blech Sec. Litig., 928 F. Supp. 1279 (S.D.N.Y. 1996) ("Blech I"), "the details regarding the workings of a market manipulation scheme are often known only by defendants."

---

[3]   Similarly, in In re IPO, 241 F. Supp. 2d at 390, the court found general allegations describing the alleged scheme, that it had the "effect" of inflating the price of the issuers' stocks above the price that would have prevailed in a fair and open market and that it was intended to artificially inflate and maintain the market price and trading volume of the issuers' stocks sufficient to allege a scheme to defraud.

25

Id. at 1291 (quoting Baxter v. A.R. Baron & Co., No. 94 Civ. 3913 (JGK), 1996 U.S. Dist. LEXIS 14882, at *5-*6 (S.D.N.Y. Oct. 12, 1995). "[T]o the extent that [the] Defendants' roles are not distinguished from each other, the inextricable linkage among them in the management of [the company] excuses such a blurring of roles at this juncture." 928 F. Supp. at 1291. Here, there is an "inextricable linkage" pled between FNY Capital, FNY Millennium and Shane, each of which served an integral part of the alleged fraud. Id. These allegations in the FAC "present sufficient detail at this pre-discovery phase, given the facts that could be expected to be within Plaintiffs' purview." Id.

FNY Millennium and FNY Capital contend that Shane's acts must be imputed to them before liability may attach. (FNY Mem. at 8.) However, the FAC alleges their own direct participation in the fraudulent scheme described above. Moreover, FNY Millennium's and FNY Capital's reliance on In re Fidelity/Micron Sec. Litig., 964 F. Supp. 539 (D. Mass. 1997) is misplaced. (FNY Mem. at 9-10.) That decision is inapplicable to the facts and allegations in this case because it involved an attempt by the plaintiffs to impute the statements of Jeffrey Vinik to the Magellan Fund he managed and did not implicate the liability of a participant in a fraudulent scheme for its own, or imputed, acts in violation of Rule 10b-5(a) and (c). See, e.g., Parmalat II, 376 F. Supp. 2d at 503 (liability for participation in a fraudulent scheme is a "different matter" from liability premised on a false statement or omission).

26

The FAC has alleged a strong inference of FNY Millennium's scienter based upon: (1) its own shorting of CompuDyne stock after being informed of the confidential non-public PIPE; (2) its continued shorting of CompuDyne stock after receipt of the Purchase Agreement that unequivocally prohibited any trading in CompuDyne stock; and (3) its "naked" unlawful shorting of CompuDyne stock in direct contravention of the Purchase Agreement. That the actions of FNY Millennium in furtherance of the fraud were taken by Shane as its manager is immaterial. See Blech I, 928 F. Supp. at 1292 ("[a]n inference of conscious or reckless behavior is created by the circumstances presented, including the close ties of Blech, Baird Patrick, and Prodani [Baird Patrick's representative].").

Liability under Rule 10b-5 may be established under agency principles, and Defendants do not contend otherwise. See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001) ("Central Bank did not eliminate primary liability for business entities.").[4] Under agency principles, the general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never

_____

[4] Cromer Finance Ltd. v. Berger, No. 00 Civ. 2284 (DLC), 2002 U.S. Dist. LEXIS 7782, at *21 (S.D.N.Y. May 2, 2002) ("Cromer") ("Central Bank does not undermine the application of the hoary principles of agency law to hold principals responsible for the misstatements and omissions of their agents."); Gabriel Capital L.P. v. NatWest Fin., Inc., 122 F. Supp. 2d 407, 430 (S.D.N.Y. 2000) ("I agree with those courts that have held that agency liability must survive Central Bank in order to ensure that corporations remain subject to § 10(b).").

actually communicated to it.  New York Univ. v. First Fin. Ins. Co., 322 F.3d 750, 753 n.2 (2d Cir. 2003); New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001). Further, as this Court observed in DGM Inv. Inc. v. New York Futures Exch. Inc., 265 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) ("DGM"), "even if the [principal] never participated or even knew about [their agent's] acts, they are strictly liable for them as long as he served as their agent."[5]

With respect to liability of a business for the acts of its employees, the Second Circuit has held that "a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take."  SEC v. Franco, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) (citing SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972)).

Here, the FAC alleges that Shane was acting on behalf of and for the benefit of both FNY Millennium and FNY Capital.  (FAC ¶¶ 8-9, 70-71.)  Thus, Shane's acts and knowledge are attributable at this stage to FNY Millennium and FNY Capital.

---

[5] An exception to the general rule exists where the agent has "totally abandoned" the principal's interests.  Bank of China v. NBM LLC, 359 F.3d 171, 179 (2d Cir. 2004).  However, Shane's conduct was not adverse to FNY Millennium.  Shane's trades for FNY Millennium were clearly intended to benefit FNY Millennium as well as herself.  (See FAC ¶¶ 52-54.)  Thus, the exception is inapplicable.  See DGM, 265 F. Supp. 2d at 262 (adverse interest "exception does not apply 'when the agent acts both for himself and the principal.'").

28

Relying on <u>Maung Ng We & Massive Atl. Ltd.</u>, No. 99 Civ. 9687 (CSH), 2000 U.S. Dist. LEXIS 11660 (S.D.N.Y. Aug. 15, 2000), FNY Millennium argues that it must have control over Shane for there to be an agency arrangement between them. <u>Maung Ng We</u> is not relevant to FNY Millennium's liability because it concerned a situation where the plaintiffs sought to impose an agency relationship arising from the "actual authority" of a parent over its subsidiary. <u>Id.</u> at *10-*11.

With respect to FNY Capital, an agency relationship has been adequately alleged because the FAC alleges that it delegated to Shane the right to act for it in trading the assets of FNY Millennium and that Shane accepted that undertaking. It is alleged that FNY Capital had ultimate responsibility for the management of FNY Millennium, as it, rather than Shane, executed the Purchase Agreement on behalf of FNY Millennium.  (FAC ¶ 41.)  <u>See Maung Ng We</u>, 2000 U.S. Dist. LEXIS 11660, at *11-*12 (to establish agency, "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.");  <u>Cromer Fin. Ltd. v. Berger</u>, 2002 U.S. Dist. LEXIS 7782, at *11, *14 ("the plaintiff's allegations of agency rest sufficiently on Deloitte's organization of its own business operations and the way it chose to use its member firms generally, and DTB [Deloitte Bermuda] and Jack [DTB Partner in charge of audit and participant in Deloitte's

29

practice] specifically."). Shane's knowledge and actions in furtherance of the fraudulent scheme be imputed to FNY Capital at this stage.

In an attempt to avoid this result, FNY Capital contends that it must have "directed" or "specifically authorized in advance" Shane's short selling of CompuDyne stock on behalf of FNY Millennium. (FNY Mem. at 11.) However, as explained by the court in Cromer Fin. Ltd. v. Berger, 245 F. Supp. 2d 552 (S.D.N.Y. 2003 ("Cromer II"), for agency purposes:

> no longer is an employer necessarily excused merely because his employees, acting in furtherance of his interests, exhibit human failings and perform negligently or otherwise in an unauthorized manner. Instead, the test has come to be whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.

Id. at 560 (citing Riviello v. Waldron, 47 N.Y.2d 297, 302, (1979)). Accordingly, Shane's conduct, which is alleged to have been undertaken within the scope of her responsibilities, may be imputed at this stage to both FNY Capital and FNY Millennium.

Lastly, FNY Millennium and FNY Capital challenge the particularity of Plaintiffs' agency allegations. The existence of an agency relationship need only be pled in compliance with Fed. R. Civ. P. 8. See In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005) ("Parmalat I"). The FAC adequately alleges the

30

aforementioned agency relationships in that it alleges in numerous paragraphs that Shane was responsible for the management of FNY Millennium at the behest and for the benefit of FNY Millennium's general partner, FNY Capital. (See FAC ¶¶ 8-9, 29-30, 32-36, 43-45, 48-49, 51-52, 70.)

These allegations are sufficient to impute Shane's knowledge and actions to FNY Millennium and FNY Capital. See Parmalat I, 375 F. Supp. 2d at 291 (finding general allegations that Deloitte Italy and the other member firms conducting the Parmalat audit did so as the agents or otherwise under the control of Deloitte USA and DTT were sufficient); DGM, 265 F. Supp. 2d at 262 (finding allegations that Eisler was the Chairman of NYFE and NYFE's Steering Committee and that he acted within the scope of his duties and position sufficient to allege an agency relationship); Cromer I, 2002 U.S. Dist. LEXIS 7782, at *7, *13 (general allegations and the inferences that could be fairly drawn from them, held to be sufficient to "adequately allege[] that Jack had actual authority to act as Deloitte's agent when performing audit work.").[6]

---

[6] FNY Capital and FNY Millennium further contend that none of Shane's actions prior to October 8 may be imputed to them because, they argue, none of those actions were taken on their behalf, or for their benefit. FNY Mem. at 13 n.3. This argument ignores the allegations in the complaint that Shane managed FNY Millennium throughout the relevant time period on behalf of FNY Capital, ¶¶ 8-9, and "acted as agent of FNY Capital in her capacity as manager of FNY Millennium on behalf of FNY Capital . . . which also benefitted from the illegal short sales in FNY Millennium's account" prior to October 8, 2001. ¶¶ 59, 61, 70.

31

Both FNY Capital and FNY Millennium are alleged to have had the motive and opportunity to commit the alleged fraud. Motive is defined as "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and opportunity is defined as "the means and likely prospect of achieving concrete benefits by the means alleged." Shields v. Citytrust Bankcorp., Inc., 25 F.3d 1125, 1130 (2d Cir. 1994); Scholastic, 252 F.3d at 74 ("Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct.").

With respect to opportunity, it is alleged that both FNY Capital and FNY Millennium were aware of the PIPE offering through Shane well before it was made public. Therefore, each had foreknowledge of the PIPE and therefore the opportunity to participate in and/or devise the fraudulent scheme with Shane.

As for motive, profiting from "unusual" insider transactions has been recognized as highly probative of motive and scienter. See Scholastic, 252 F.3d at 74; Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). As is alleged, FNY Millennium and FNY Capital both stood to profit, and in fact profited, from the alleged illegal scheme to obtain the PIPE shares at as low a price as possible and use those shares to cover "naked" short sales of

32

235,000 shares of CompuDyne stock. Financial motive has therefore been adequately alleged.[7]

The Plaintiffs' claim that Defendants' illegal short selling proximately damaged them is straight forward. But for Defendants' insider trading and illegal short selling, Plaintiffs claim that they would have received a price higher than $12 per share for the shares sold in the PIPE. (FAC ¶ 72.) Plaintiffs allege that the first part of Defendants' scheme to illegally sell short CompuDyne stock artificially depressed and/or increased the volatility of CompuDyne's stock price between Friday, September 28, 2001, and Friday, October 5, 2001, the trading period immediately prior to Monday, October 8, 2001, the date on which CompuDyne and its investment banker priced the shares to be sold in the PIPE. (FAC ¶¶ 2, 73.) Plaintiffs also allege that the price of shares issued in connection with a PIPE was "discounted from the prevailing market price." (FAC ¶ 16.) Thus, the lower the market price of CompuDyne stock prior to the pricing of the PIPE, the lower the shares to be issued in connection with PIPE would be priced, and the less money Plaintiffs would receive from the PIPE.

_____

[7] See Internet Law Library, 223 F. Supp. 2d at 484-85; In re MCI Worldcom, Inc. Sec. Litig., 93 F. Supp. 2d 276 (E.D.N.Y. 2000) (bidder's denial of merger rumors in order to eventually announce bid at lower price deemed sufficient); In re Guilford Mills, Inc. Sec. Litig., No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690, at *12 (S.D.N.Y. July 21, 1999 (on motion to dismiss, allegations that officers of parent corporation stood to gain specific financial benefits from the company's subsidiary's fraudulent conduct found sufficient to infer scienter as to both the subsidiary and the parent).

33

Plaintiffs' allegations fulfill the standard for pleading loss causation recently set forth by the Supreme Court and the Second Circuit. In <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 125 S.Ct. 1627 (2005), the Supreme Court held that merely pleading "artificial inflation" of stock was insufficient to allege loss causation because, at the moment of purchase, a plaintiff has not suffered an actual economic loss.[8] However, the Supreme Court held that to adequately plead "proximate cause" and "economic loss," Plaintiffs need only follow Fed. R. Civ. P. 8(a)(2) requiring merely "a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Id.</u> at 1627. The Supreme Court stated further that these "pleading rules are not meant to impose a great burden upon a plaintiff." <u>Id.</u> at 1634 (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512-13 (2002).[9]

<u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005), held that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was

---

[8]   Pleading loss causation based on an allegation that the plaintiff sold its stock for less than it is worth because its price was artificially depressed is not the same as pleading loss causation based on an allegation that the plaintiff purchased a stock whose price was merely artificially inflated.   A plaintiff who sells a stock at an artificially depressed price no longer possesses the shares and thus has realized an economic loss.   <u>Dura</u>, 125 S. Ct. at 1631.

[9]   The Second Circuit, citing <u>Swierkiewicz</u>, has held repeatedly that "Rule 8 pleading is extremely permissive." <u>Twombly v. Bell Atl. Corp.</u>, 425 F.3d 99 (2d Cir. 2005) (vacating dismissal of complaint) (quoting <u>Wynder v. McMahon</u>, 360 F.3d 73, 77 (2d Cir. 2004) (same)).

34

within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."[10] See also Emergent Capital, 343 F.3d at 197 ("[w]e have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission'"). The Second Circuit also reaffirmed that this analysis is ordinarily a "fact-based inquiry" that ordinarily "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Lentell, 396 F.3d at 174 (citing Emergent Capital, 343 F.3d at 197).[11]

Here, Plaintiffs allege that Shane violated Rule 10b-5(b) when she misrepresented to FBR on September 28, 2001 that she would keep information concerning the PIPE confidential, and failed to disclose the material fact that she planned to trade on this confidential information, and that Shane, FNY Millennium, and FNY Capital violated Rule 10b-5(a) and (c) in connection with their scheme to defraud Plaintiffs into selling them shares on the PIPE and to manipulate the market in CompuDyne stock by artificially depressing and/or increasing the volatility of CompuDyne stock prior to the pricing of the PIPE.

---

[10] The Supreme Court in Dura declined to "consider other proximate cause or loss-related questions." Dura, 125 S.Ct. at 1634. However, the Supreme Court cited favorably the Second Circuit's opinion in Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).

[11] See also AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 225 (2d Cir. 2000); DeMarco v. Robertson Stephens, Inc., 318 F. Supp. 2d 110, 124 n.6 (S.D.N.Y. 2004).

35

Under <u>Dura</u>, <u>Lentell</u> and <u>Emergent Capital</u>, the FAC has adequately alleged that the artificial depression and/or increased volatility in CompuDyne's stock price prior to the pricing of the PIPE was a "foreseeable consequence" of or within the "zone of risk" of Defendants' illegal insider trading and short selling, and that Defendants' misconduct proximately caused Plaintiffs to receive less money on the PIPE offering.    The FAC connects Defendants' fraud with Plaintiffs' alleged loss well within the confines of Fed. R. Civ. P. 8.    That is all that is necessary at this stage of the litigation.    <u>See</u> <u>Emergent Capital</u>, 343 F.3d at 198 (alleged "pump and dump" scheme satisfies pleading requirements for loss causation).

The contention that Shane's illegal short selling prior to the pricing of the PIPE was only "moderate [and thus] . . . could not have negatively affected the market price of CompuDyne stock" is conclusory and contrary to the allegations of the FAC, as is the contention that because Shane covered her short sales by October 5, 2001, any effect of her short selling in the four preceding days would have been completely neutralized.

The Second Circuit's decision in <u>Litton Indus. Inc. v. Lehman Bros. Kuhn Loeb Inc.</u>, 967 F.2d 742 (2d Cir. 1992) presents a similar situation.    In that case, the plaintiff, Litton Industries, Inc., alleged that its investment banker engaged in unlawful insider trading in a company, Itek Corp., that Litton was

36

about to acquire, thereby artificially inflating Itek's stock price prior to Litton's acquisition.  Id. at 744.  Litton alleged that, as a result of that illegal insider trading, it overpaid for the Itek and was damaged.  Id.  Reversing the district court's grant of summary judgment on the issue of loss causation, the Second Circuit stated that there were "three links" necessary to establish a chain of loss causation:

> (1) the trader appellees purchased stock on the basis of misappropriated information; (2) this trading inflated the market price of Itek stock; and (3) the Itek Board of Directors would have accepted a lower offer from Litton, if not for the artificially inflated market price of Itek stock.

Id.  Applying this standard, and "viewing the record in the light most favorable to Litton," the Second Circuit concluded that a reasonable jury might find that market price was a substantial factor in the Itek Board's assessment of Litton's offer and that absent insider trading the Itek Board would have accepted less than $48 per share" Litton actually paid.  Id. at 751.

Here the FAC challenged that Plaintiffs have pled these "three links": (1) Shane's misrepresentation allowed her to misappropriate information about the PIPE; (2) her trading artificially depressed and/or increased the volatility of CompuDyne stock; and (3) CompuDyne would have received a price higher than $12 per share.  The FAC therefore adequately alleges loss causation.  See Castellano v. Young & Rubicam, Inc., 257 F.3d 171,

37

188 (2d Cir. 2001).  The motion to dismiss Count I is therefore denied.

## The Motions To Dismiss The Section 20(a) Claim Are Denied

The FAC pleads that FNY Securities, a broker-dealer, is liable as a control person under section 20(a) of Shane for her misrepresentations and scheme to defraud, and that FNY Capital is liable as a control person of both Shane, as manager of FNY Millennium, and of FNY Millennium itself for the same misrepresentations and scheme to defraud.  (FAC ¶¶ 79-83.)

To plead liability under § 20(a), "a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  Dietrich v. Bauer, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) ("Dietrich III") (citations omitted).  In the Second Circuit, "the 'control person' provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'" Id. at 765.  "For purposes of Section 20(a) liability, 'actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.'" Id. (citations omitted).  Whether a person is a "controlling person" is a fact-intensive inquiry, and generally

38

should not be resolved on a motion to dismiss. In re Oxford Health Plans Inc. Sec. Litig., 187 F.R.D. 133, 143 (S.D.N.Y. 1999).

Suez Equity presents a similar situation to the case at bar. There, as here, an alleged primary violator (DeRoziere) was an agent of the alleged control person (Toronto-Dominion Bank ("Bank")). Suez Equity, 250 F.3d at 100-01. In considering whether the complaint at issue adequately alleged a claim for liability against the Bank under Section 20(a), the Second Circuit held that "broad" allegations that DeRoziere "was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with [plaintiffs]" were sufficient to allege the Bank's control person liability "derived from DeRoziere, the purported primary violator." Id. Moreover, the Second Circuit emphasized that the scope of the agency relationship is a question of fact not properly resolvable on a motion to dismiss. Id. at 100 (stating that "defendants' arguments with respect to the scope of DeRoziere's agency are best left to a later stage in the litigation."). Thus, Suez Equity holds that in the case where a primary violator is an agent of the alleged control person, Section 20 liability stems from the actions and knowledge of its agent. A plaintiff, therefore, need only plead an agency relationship with the primary violator acting in the normal course of his or her duties in connection with the alleged fraud to adequately plead control person liability. Id. at 101.

39

In Blech I, this Court rejected the defendant broker-dealer Baird Patrick's argument that plaintiffs did not allege its "culpable participation" holding that "[t]he allegation that 'Ali Prodani was an agent of Baird Patrick' . . . is sufficient at this stage of the action" for purposes of a defendant's liability under Section 20(a). Blech I, 928 F. Supp. at 1300. Similarly, in In re Blech Sec. Litig., No. 04 Civ. 7696, 2002 U.S.Dist. LEXIS 19835, at *61 (S.D.N.Y. Oct. 22, 2002) ("Blech IV"), this Court denied Baird Patrick's motion for summary judgment on plaintiff's Section 20(a) claims, finding that "Prodini's acts, as well as the fact that Baird Patrick benefited from Prodini's acts, create 'questions of fact . . . precluding the granting of summary judgment.'"

A broker-dealer, such as FNY Securities, has an "affirmative duty" to see that its employees "compl[y] with applicable securities regulations" and is subject to "certain supervision obligations imposed on broker-dealers by Section 15 of the 1934 Act," and the failure to supervise satisfies the culpable participation element to establish liability under Section 20(a). Dietrich III, 126 F. Supp. 2d at 767-68. See also Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir. 1980) (reversing judgment in favor of defendant broker-dealer and stating that "[w]hile the precise standard of supervision required of broker-dealers to make the good faith defense of Section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house

40

receives a commission on the transaction, the burden of proving good faith is shifted to the brokerage house.").

This obligation on the part of broker-dealers is consistent with showing culpable participation since "the controlling person 'knew or should have known' that the controlled person 'was engaging in fraudulent conduct.'" Blech IV, 2002 U.S. Dist. LEXIS 19835, at *59; see also Dietrich III, 126 F. Supp. 2d at 765 (noting the "blindness standard" that liability may be found where the control person "knew or should have known that [the] primary violator, over whom the person had control, was engaged in fraudulent conduct, but . . . did not take steps to prevent the primary violation." (internal quotation marks omitted)).

According to the allegations in the FAC, FNY Securities, FNY Capital, FNY Millennium, and FNY Securities' traders such as Shane, all operate from FNY Securities offices in New York. (FAC ¶¶ 7-9.) All of the stock trading done by these entities/traders is executed by FNY Securities. (FAC ¶¶ 29, 55.) All of FNY Securities' traders complete a rigorous training program lasting 18-24 months. (FAC ¶ 7.) Shane was a salaried employee and "proprietary trader" at FNY Securities and a manager of FNY Millennium as an agent of FNY Capital. (FAC ¶¶ 6, 8-9.) FNY Securities' "proprietary traders," trade FNY Securities' own capital, splitting any profits with FNY Securities. (FAC ¶ 7.)

41

FNY Capital's direct control over Shane with respect to her duties as a manager of FNY Millennium, and its "culpable participation" is demonstrated by the fact that FNY Capital, not Shane, had to authorize FNY Millennium's purchase of 238,000 shares of CompuDyne stock in connection with the PIPE. (FAC ¶ 41.) The signature page of Shane's signed Purchase Agreement with FNY Millennium's Purchase Agreement were both faxed by the offices of FNY Securities. (FAC ¶ 81.)

Shane's trading scheme in CompuDyne stock is alleged to have spanned from September 28, 2001 through October 30, 2001, and to have comprised over 975 short trades totaling 563,100 shares of CompuDyne stock executed through FNY Securities. (FAC ¶¶ 29, 55.) The trades took place in at least three accounts: (i) FNY Securities' "propriety trading" account run by Shane; (ii) Shane's personal account at FNY Securities; and (iii) FNY Millennium. (FAC ¶¶ 29, 47-48.) Both FNY Securities and FNY Capital benefited from Shane's trading because they received a portion of the over $1.13 million gains from these trades. (FAC ¶¶ 7, 70 81.)

FNY Securities does not dispute that Plaintiffs have adequately pled a primary violation against FNY Securities' representative, Shane. Nor does it dispute that it had actual control over Shane. Rather, FNY Securities rests its argument on claiming that Plaintiffs have not adequately alleged "culpable participation" against it.

42

First, contrary to FNY Securities' argument, the FAC does allege that it "profited" from these trades.  (FAC ¶¶ 7, 81.)  FNY Securities relies primarily on one decision, In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193 (E.D.N.Y. 2000), in arguing that Plaintiffs have not adequately alleged culpable participation.  (FNY Sec. Mem. at 14-15.)

However, Twinlab is distinguishable on its face because the defendants alleged to be liable under Section 20(a) were certain company officers -- not, as is the case here, a broker-dealer liable as a control person of its agent.  The same is true with respect to FNY Securities' reliance on In re Livent Inc., Sec. Litig., 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999) ("Livent I") in which the Court dismissed control person claims against "outside directors."  The circumstances in Suez Equity, Marbury, Deitrich, Blech I, and Blech IV, which related to the Section 20(a) liability of defendant banks/broker-dealers for the fraudulent acts of their agents, are more analogous to this case.

FNY Securities also has argued that Shane "conducted the scheme outside the scope of her employment."  As discussed above, the well pled facts in the FAC allege that at all times Shane was acting within the scope of her employment and that FNY Securities participated in the scheme by, inter alia, executing over 975 illegal trades over a five-week period and benefited financially from Shane's illegal scheme.  (FAC ¶¶ 7, 55, 81-82.)  Since Shane

43

is alleged to have used FNY Securities' own capital to short CompuDyne stock in its "proprietary accounts," it is reasonable to infer from all of these allegations that FNY Securities was, at a minimum, "willfully blind" to Shane's illegal scheme.

FNY Capital does not dispute that Plaintiffs have adequately pled a primary violation against Shane nor does FNY Capital dispute that it had actual control over Shane and FNY Millennium. Like FNY Securities, FNY Capital rests its argument on claiming that Plaintiffs have not adequately alleged "culpable participation" against it. (FNY Mem. at 18.)

In an agency situation, control person liability is properly pled by pleading control over the agent/primary violator while the agent is acting within the scope of their duties in connection with the illegal acts. See, e.g., Suez Equity, 250 F.3d at 101 (finding control person liability sufficiently pled); Blech I, 928 F. Supp. at 1300 (finding culpable participation adequately pled). The FAC sufficiently pleads that Shane was an agent of FNY Capital in connection with her management of FNY Millennium and that she acted in the normal course of her duties when she sold short CompuDyne stock in FNY Millennium's account beginning on September 28, 2001, which conduct benefited FNY Capital as the general partner of FNY Millennium. Accordingly, FNY Capital's argument that Plaintiffs have not fulfilled the requirements for pleading "culpable participation" is rejected.

44

## The Motions To Dismiss The Common Fraud Claim Are Denied

In order to plead common law fraud, including fraudulent inducement, "plaintiffs must show a material false representation or omission of an existing fact, which defendants made with knowledge of its falsity and intent to defraud, and which plaintiffs relied upon to their detriment. Kline v. Taukpoint Realty Corp., 754 N.Y.S.2d 899 (N.Y. App. Div. 2d Dep't 2003) (citing Vermeer Owners v. Guterman, 78 N.Y.2d 1114, (1991))." These requirements are essentially identical to those for pleading a violation of Rule 10b-5. JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985 (HB), 2005 U.S. Dist. LEXIS 27156, at *30-*31 (S.D.N.Y. Nov. 10, 2005. Indeed, Defendants concede this point. (See Shane Mem. at 17; FNY Mem. at 7 n.2.) Accordingly, the motions to dismiss the common law fraud claims are denied.

## The Motions of Shane, FNY Millennium And FNY Capital To Dismiss The Contract Claim Are Denied

The FAC has alleged that Shane breached the oral promise she made on or about September 28, 2001 to maintain the confidentiality of information regarding the existence and timing of Plaintiffs' anticipated PIPE offering. (FAC ¶ 90.)

Shane has challenged this cause of action on the grounds that she never promised not to improperly use the information; only to keep it confidential. However, every contractual undertaking

45

carries with it an implied covenant of fair dealing.    511 West
232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 746
N.Y.S.2d 131, 135 (2002).    This covenant, the New York Court of
Appeals has held:

> embraces a pledge that "neither party shall do anything
> which will have the effect of destroying or injuring the
> right of the other party to receive the fruits of the
> contract" ...  While the duties of good faith and fair
> dealing do not imply obligations "inconsistent with other
> terms of the contractual relationship" ... they do
> encompass "any promises which a reasonable person in the
> position of the promisee would be justified in
> understanding were included."

511 West 232nd Owners Corp., 98 N.Y.2d at 153, 746 N.Y.S.2d at 135-
36 (citations omitted).    From Plaintiffs' perspectives, the
insistence of confidentiality was "intended, inter alia, to prevent
purchases or sales (including short sales) of CompuDyne common
stock by those who learned of this material non-public
information."   (FAC ¶¶ 20, 28.)   Shane's use of the confidential
information provided to her to short CompuDyne stock therefore
violated this covenant.

Shane contends that Plaintiffs have not alleged "legally
cognizable" damages caused by any breach of this promise.   (Shane
Mem. at 18.)   The standard for pleading damages from a breach of
contract is virtually the same as that for pleading loss causation.
Both are satisfied where the damage is alleged to have been
proximately caused by the wrongful conduct.   See Merrill Lynch &

Co. v. Allegheny Energy, No. 02 Civ. 7689 (HB), 205 U.S. Dist. LEXIS 14216, at *19-*20 (S.D.N.Y. July 18, 2005). Accordingly, for the reasons set forth, damage proximately flowing from this breach has been adequately alleged.

The Plaintiffs also assert that FNY Millennium breached a promise not to trade on information concerning the PIPE "both before and after the public announcement of the PIPE." (FAC ¶ 93.) Shane's promise may be attributed to FNY Millennium because she was acting within the scope of her employment as manager of FNY Millennium when making that promise. (FAC ¶¶ 6, 8-9.) Moreover, the FAC has alleged that FNY Millennium traded on the confidential information imparted to its manager prior to the pricing of the PIPE. (FAC ¶¶ 9, 70(b); 2.) Thus, Plaintiffs have alleged a viable breach of contract claim against FNY Millennium.

## The Motion To Dismiss Unjust Enrichment Claim Is Granted

In order to recover for unjust enrichment, Plaintiffs must plead and prove three elements:

That the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the defendant.

Mina Inv. Holdings Ltd. v. Lefkowitz, 51 F. Supp.2d 486, 489 (S.D.N.Y. 1999) (quoting Dolmetta v. Uintah Natl. Corp., 712 F.2d

47

15, 20 (2d Cir. 1983)). The FAC does not assert that either Plaintiff was a counter-party in connection with any of the trades in CompuDyne common stock that Shane allegedly directed. Nor do Plaintiffs claim that they were trading CompuDyne common stock on the open market between September 28, 2001 and October 30, 2001.

The Plaintiffs appear to concede that they were not counterparties to any of the trades in CompuDyne common stock that Shane executed between September 28 and October 30, 2001. (Pl. Br. 48.) In each of the cases cited by Plaintiffs in support of their unjust enrichment claims, the court found that the defendant had received either directly or indirectly, money or property from the plaintiff and therefore had been enriched at plaintiff's expense.[12] Here, any proceeds that FNY Millennium allegedly received from Shane's trade in CompuDyne common stock before October 8 came from the counterparties to those transactions, not from CompuDyne or Blair. Thus, FNY Millennium could not have been enriched by these

---

[12] Cox v. Microsoft Corp., 778 N.Y.S.2d 147, 149 (N.Y. App. Div. 1st Dep't 2004) (unjust enrichment claim could proceed where plaintiff alleged that defendant's wrongful conduct "caused them to pay artificially inflated prices for [defendant's] products."); Sultan v. Read, 2005 WL 486732, at *5 (S.D.N.Y. March 1, 2005) (unjust enrichment claim could proceed where complaint alleged that defendant personally received the use value of plaintiff's art collection); Rickel & Assocs. v. Smith, 272 B.R. 74, 97 (Bankr. S.D.N.Y. 2002) (unjust enrichment claim could proceed where "plaintiffs contend[ed] that they were defrauded into selling to the defendants securities worth nearly $21 million for less than $4 million."). See also Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (dismissing claim against wife whose husband was unjustly enriched by loan where wife did not "actually receiv[e] any portion of the loan," and her alleged receipt of an "indirect benefit from the loan" did "not establish the specific and direct benefit necessary to support an unjust enrichment claim.").

trades at Plaintiffs' expense. Accordingly, Plaintiffs' unjust enriichment claims must be dismissed.

## The Motion Of FNY Securities To Dismiss The Respondeat Superior Claim Is Denied

According to the FAC, Shane was registered with the NASD as a general securities representative at FNY Securities where she served, inter alia, as a manager of FNY Securities-affiliated hedge fund accounts, like FNY Millennium and as "proprietary trader" of FNY Securities own capital. (FAC ¶¶ 6-9, 82, 100-103.) FNY Securities executed all of Shane's illegal trades. (FAC ¶ 55.) Thus, there is no reasonable inference that Shane acted without authority to trade for the benefit of FNY Securities, as she did here in selling CompuDyne stock short. (FAC ¶¶ 6-7, 36, 54, 81-82, 99.)

Moreover, as noted above, whether Shane was acting within the scope of her employment is a question "for a jury to answer." Crigger v. Fahnestock and Co., Inc., No. 01 Civ 0781 (JFK), 2003 U.S. Dist. LEXIS 16438, at *36 (S.D.N.Y. Sept. 18, 2003) (denying defendant broker's motion to dismiss claim based on respondeat superior).

As noted above, FNY Securities received profits arising out of the challenged transactions as a result of its employment

49

contract with Shane, including, according to the FAC, both the pre and post October 8 purchases and sales.  (FAC ¶¶ 6-7, 81-82.)

As concluded above, the FAC adequately pleads facts that, at this stage of the litigation, raises a reasonable inference that Shane was acting within the scope of her employment at FNY Securities when she carried out this illegal short scheme.  See, e.g., First Interregional, 805 F. Supp. at 202 (denying motion to dismiss and stating defendant "has not met its heavy burden of showing that [plaintiff] can prove no set of facts in support of its claim which would entitle it to relief.").

## The Motion of FNY Capital To Dismiss The Partnership Liability Claim Is Denied

FNY Capital has contended that the partnership liability claim must be dismissed because it is "entirely derivative of -- and thus fails along with -- plaintiffs' claims against Millennium."  (FNY Cap. Mem. at 19.)  Because Plaintiffs have adequately alleged claims against FNY Millennium, FNY Capital's motion to dismiss the partnership liability claim must be denied.

50

## Conclusion

For the reasons set forth above, the motions of Shane, FNY Securities, and FNY Millennium and FNY Capital are granted as to Plaintiffs' unjust enrichment claims, and are denied in all other respects.

It is so ordered.

New York, NY
September  29  , 2006

ROBERT W. SWEET
U.S.D.J.

51